20    *Charvat v. Eastern Ohio*
*Regional Wastewater, et al.*                    No. 00-3431

We lack jurisdiction to review any of these issues at the present time. In the absence of a certification consistent with Rule 54(b) of the Federal Rules of Civil Procedure, pretrial orders of a district court are not final orders for the purposes of 28 U.S.C. § 1291 and are not appealable until the district court has entered a final judgment. *See Good v. Ohio Edison Co.*, 104 F.3d 93, 95 (6th Cir. 1997). The defendants insist, however, that because Charvat has allegedly failed to establish a constitutional violation, we should use our pendent appellate jurisdiction to decide that the district court erred in denying their motion for judgment on the pleadings. *See Mattox v. City of Forest Park*, 183 F.3d 515, 524 (6th Cir. 1999) (holding that because the plaintiff did not allege a constitutional injury sufficient to state a § 1983 claim for retaliation in violation of the First Amendment, the court could reverse the district court's denial of summary judgment to the City of Forest Park). Here, however, the record reflects that Charvat has sufficiently alleged a violation of his First Amendment rights to support a claim under § 1983. We therefore decline to exercise pendent appellate jurisdiction to address these claims.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

---

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0107P (6th Cir.)
File Name: 01a0107p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

DAVID CHARVAT,
        *Plaintiff-Appellee,*

v.                                    No. 00-3431

EASTERN OHIO REGIONAL
WASTEWATER AUTHORITY,
et al.,
        *Defendants-Appellants.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 97-01035—George C. Smith, District Judge.

Argued: March 14, 2001

Decided and Filed: April 9, 2001

Before: COLE and GILMAN, Circuit Judges; BORMAN,
District Judge.

———————————

## COUNSEL

**ARGUED:** James A. King, PORTER, WRIGHT, MORRIS & ARTHUR, Columbus, Ohio, for Appellants. Edward

---

[*]The Honorable Paul D. Borman, United States District Judge for the Eastern District of Michigan, sitting by designation.

Dennis Muchnicki, Dublin, Ohio, for Appellee. **ON BRIEF:** James A. King, Daniel W. Costello, PORTER, WRIGHT, MORRIS & ARTHUR, Columbus, Ohio, for Appellants. Edward Dennis Muchnicki, Dublin, Ohio, Richard R. Renner, TATE & RENNER, Dover, Ohio, for Appellee.

_____

**OPINION**

_____

RONALD LEE GILMAN, Circuit Judge. David Charvat, a former superintendent of the Eastern Ohio Regional Wastewater Authority (EORWA), filed suit under 42 U.S.C. § 1983, claiming that he was terminated in violation of his First Amendment rights. On September 6, 1995, the Board of Trustees of EORWA voted to fire Charvat on the basis of his alleged managerial incompetence. Charvat, however, claims that the Board fired him because he reported EORWA's violations of several environmental regulations. He initially filed an administrative complaint pursuant to the whistleblower provisions of the Clean Water Act (CWA) and the Safe Drinking Water Act (SDWA). Charvat later filed this action in federal court against EORWA, the four members of EORWA's Board of Trustees, and two additional EORWA employees. All parties to the dispute filed motions for summary judgment. The district court issued an order denying the motions for summary judgment filed by Charvat and EORWA, as well as the individual defendants' motion for summary judgment based on qualified immunity.

EORWA and the six individual defendants jointly appealed. They argue that the district court erred in failing to grant the individual defendants qualified immunity, in denying their collective motion for judgment on the pleadings, and in failing to hold that the whistleblower provisions of the CWA and the SDWA preclude a separate action under § 1983. For the reasons set forth below, we **AFFIRM** the judgment of the

the district court citing additional reasons why it should have granted their motion for judgment on the pleadings. They argue that they cannot be held liable under Charvat's § 1983 retaliation claim because they played no role in the decision-making process to terminate Charvat. As a result, even if Charvat's statements qualify as constitutionally protected speech, they claim that they were not responsible for the action that allegedly caused his First Amendment injury. *See Bloch v. Ribar*, 156 F.3d at 678 (requiring a plaintiff to show "that the *defendant's* adverse action caused the plaintiff to suffer an injury" as part of a First Amendment retaliation claim) (emphasis added).

Pollock and Thomas, however, did not raise this issue as an assignment of error on appeal. Instead, they simply joined the four Board members in contesting the district court's denial of their motion for summary judgment based on qualified immunity. We therefore affirm the district court's denial of qualified immunity as to Pollock and Thomas along with the Board members, but recommend that the district court address the issue of whether they are even subject to a § 1983 claim when the case is remanded.

**C.    This court lacks jurisdiction to review the district court's decision denying the defendants' motion for judgment on the pleadings**

EORWA, the Board members, Pollock, and Thomas raise several arguments supporting their claim that the district court erred by not granting their motion for judgment on the pleadings. First, they insist that Charvat failed to allege any violation of a constitutional right. Second, they argue that Charvat's suit against the Board members, Pollock, and Thomas in their official capacities is deficient because EORWA is the only relevant defendant. Finally, they maintain that Charvat's claim against EORWA must fail because he has not shown that any alleged constitutional deprivation was the result of an official policy.

and potential threats to the public health and safety of the community. This court has declared that the "[p]ublic interest is near its zenith when ensuring that public organizations are being operated in accordance with the law." *Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986).

The defendants also argue that the district court erred by failing to engage in an explicit analysis that balanced Charvat's free-speech rights against the "interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. They claim that Charvat unnecessarily decreased employee morale by openly criticizing the operations of EORWA. The Board members maintain that they were required to restrain Charvat's speech in order to safeguard the efficiency of the plant's day-to-day operations. They again miss the point with this contention. Charvat's responsibilities as superintendent of EORWA included more than managing its employees; of at least equal importance was ensuring that the plant complied with environmental regulations. Although the district court's order did not detail its analysis under the *Pickering* balancing test, its weighing of the competing interests in favor of Charvat for the purposes of summary judgment is implicit in its order.

Having concluded that Charvat's speech implicated matters of public concern, it seems clear that Charvat has met his burden of establishing a prima facie case for retaliation under *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998). Given the totality of evidence in the record, the defendants' argument that Charvat has failed to state a claim under the First Amendment for the purposes of his § 1983 suit is weak. We therefore agree with the district court's decision to deny summary judgment based on qualified immunity for the four Board members.

A final note concerning Pollock and Thomas is due. Although Pollock and Thomas joined in the appeal by the four Board members, they filed a supplemental motion before

district court and **REMAND** the case for further proceedings consistent with this opinion.

## I. BACKGROUND

### A.   Factual background

Officials of Belmont County, Ohio created EORWA pursuant to Ohio Revised Code § 6119. This facility is a wastewater treatment plant on the Ohio River that serves four municipalities. Each of the four mayors appoints a trustee to EORWA. The Board of Trustees governs the operations of EORWA under Ohio Revised Code § 6119.07.

Charvat began working as the superintendent of EORWA on July 5, 1994. At the time of Charvat's employment, the Board consisted of Charles Wilson, the president, Michael Thomas, the vice-president, James Tekely, the secretary, and Felipe Lavapies. Charvat worked alongside David Thomas, the office manager of EORWA who reported directly to the Board, and Paul Pollock, then EORWA's chief operator. EORWA employed about twenty persons to operate its wastewater and sewage treatment facility at the time when Charvat was superintendent.

Charvat assumed his position unaware of EORWA's noncompliance with various environmental regulations. He quickly learned, however, of its numerous regulatory violations. The CWA, 33 U.S.C. § 1342(a), requires EORWA to obtain a National Pollutant Discharge Elimination System (NPDES) permit from the Ohio Environmental Protection Agency (OEPA) in order to operate as a wastewater treatment facility. EORWA is also required to follow OEPA's standards for the maintenance of three things: (1) the wastewater collection system at the plant, (2) the plant facilities, and (3) the sludge farm where waste is treated. OEPA regulations require that treatment facilities test the final effluent that they produce and self-report any violations of the regulations to OEPA.

Charvat soon uncovered problems at EORWA's facilities. For example, he discovered that sometime between 1991 and 1993 a water pump at EORWA that provided nonpotable water for cleaning equipment had broken. Rather than fix the pump, an EORWA employee had cross-connected the sewer-plant system with the public water supply without installing any backflow preventers. This modification created the potential for raw sewage to enter the public water supply. Furthermore, Charvat became aware that EORWA had evaded enforcement by failing to self-report its regulatory violations to OEPA.

In July of 1994, Charvat attended his first meeting with the Board. He reported to them that the plant had operational problems that required immediate attention, that staff morale and motivation were low, and that he intended to improve communications with OEPA. To better assess the situation, he requested support from the Board, particularly in the form of an engineering study of the treatment facilities. The Board took no action in response to Charvat's request. Charvat repeated his concerns to the Board in another meeting in August of 1994. The Board again failed to respond.

EORWA's employees were not accustomed to reporting operational violations under Charvat's predecessor. In fact, Charvat claims that the employees feared losing their jobs if they did so. One plant operator, Paul Russell, had written anonymous letters to Board Member Wilson outlining EORWA's permit violations. When Wilson failed to take action, Russell made his reports available to OEPA, which conducted an investigation of EORWA in collaboration with Ohio's Bureau of Criminal Investigations. OEPA issued a letter to EORWA in December of 1993 that listed many of EORWA's violations. Russell alleged that his coworkers subjected him to a hostile work environment as a result of his attempt to report regulatory violations to OEPA.

Charvat's efforts resulted in a greater reporting of permit violations. In November of 1994, Charvat asked OEPA to

protection. Furthermore, they argue that his first letter only concerns personnel issues, not matters of public concern.

The defendants rely on the case of *Connick v. Myers*, 461 U.S. 138 (1983), in support of their argument on this issue. In *Connick*, the Supreme Court held that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest," the federal courts must refrain from reviewing a public agency's employment decision regarding that employee. *Id.* at 147. Such was found to be the case in *Connick*, where the Court determined that a district attorney's circulation of a questionnaire regarding office policies on internal transfers did not constitute a matter of public concern.

The defendants interpret this statement from *Connick* expansively by arguing that regardless of the substance of Charvat's speech, it can never be deemed to be of public concern because Charvat was an employee of EORWA, not a private citizen, when he voiced his criticism of EORWA's noncompliance with the environmental regulations. We disagree. The First Amendment protects speech on matters of public concern made by public employees in their role as employees, even if their speech is not communicated to the public. *See Chappel v. Montgomery Fire Prot. Dist. No. 1*, 131 F.3d 564, 579 (6th Cir. 1997) ("Constitutional protection for speech on matters of public concern is not premised on the communication of that speech to the public. . . . To the extent, then, that [the § 1983 plaintiff] spoke with individual board members about these important matters, we conclude that [he] spoke on matters of public concern.")

Characterizing Charvat's speech as regarding only personnel issues and internal operations is disingenuous at best. Charvat's reports about the sewage-treatment facility's violation of a number of environmental regulations, when analyzed for their "content, form, and context," *Connick*, 461 U.S. at 147-48, are a perfect example of protected speech that is designed to increase the awareness of regulatory violations

chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

*Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998). It is also well established that speech involving matters of public concern constitutes protected speech under the First Amendment. *See Rankin v. McPherson*, 483 U.S. 378, 384 (1987) ("The threshold question . . . is whether [an employee's] speech may be 'fairly characterized as constituting speech on a matter of public concern.'") (citations omitted). This right to protected speech, however, is not unlimited. Once a plaintiff states a § 1983 claim for unlawful retaliation, a court must decide if "the interest of the employee as a citizen, in commenting on matters of public concern, outweighs the employer's interest in promoting the efficiency of the public services it performs through its employees." *Perry v. McGinnis*, 209 F.3d 597, 604 (6th Cir. 2000) (holding that a complaint of race discrimination made to an employer in the context of an internal grievance constituted a matter of public concern meriting First Amendment protection) (internal quotation marks omitted).

The essence of the defendants' argument is that the letters that Charvat wrote to OEPA and to the Board, detailing what he perceived to be blatant violations by EORWA of environmental regulations concerning wastewater treatment in Belmont County, Ohio, do not involve matters of public concern. Rather, they contend that Charvat's statements on the technology and operations of EORWA only implicate the internal management of EORWA as a business entity, and therefore do not concern the public. Charvat's first letter was the monthly report that he submitted to OEPA in May of 1995. His second was the letter that he sent to the Board regarding EORWA's environmental compliance on June 30, 1995. The defendants argue that Charvat wrote these letters as an employee of EORWA, not as a public citizen, and that the statements therefore do not warrant First Amendment

provide a Technical Assist Team to visit EORWA's plant. OEPA subsequently placed EORWA on its significant noncompliance list. An OEPA staff person contacted Charvat on December 20, 1994 to inform him that OEPA would reopen its 1993 investigation of EORWA. Shortly thereafter, Wilson called Charvat and expressed his anger that Charvat's actions had resulted in the reopening of the OEPA investigation. Wilson also allegedly made a statement to Charvat to the effect that Wilson would not have his political career ruined by the sewage authority.

Charvat later informed Board Member Tekely that Office Manager Pollock, among others, was in Charvat's opinion responsible for operating the plant in violation of permit requirements and for discouraging employees from reporting the violations. Tekeley suggested that Charvat reorganize the staff. Charvat alleges that the Board initially assured him of its support for his reorganization plan. The Board, however, later criticized the plan that he eventually devised and cited it as an example of his incompetence in managing the workplace. It also invited employees to a confidential meeting to discuss the implications of Charvat's reorganization plan. The Board later told Charvat that Pollock was the only employee who complained about Charvat's performance as superintendent.

The rancor between Charvat and the Board intensified from January of 1995 until the time of Charvat's termination in September of that year. Furthermore, Charvat and Pollock had a dispute in May of 1995 that resulted in Charvat disciplining Pollock for insubordination. Pollock subsequently filed charges against Charvat with OEPA. Charvat responded with a letter detailing Pollock's mismanagement of EORWA's operations. The letter also highlighted more EORWA permit violations. The Board held a closed-door meeting on May 22, 1995, after which it informed Charvat that he had 90 days to improve employee morale and plant operations.

On June 30, 1995, the Ohio Attorney General (OAG) notified EORWA that he was commencing a civil enforcement action that could impose a substantial civil penalty on EORWA. The letter also proposed that EORWA engage in negotiations with the OAG to settle the dispute. Aware of the gravity of the situation, Charvat sent a formal letter to the Board, recommending the disclosure of known regulatory violations and a comprehensive internal investigation to uncover the extent of EORWA's noncompliance with OEPA's permit requirements. Charvat maintains that this letter constituted protected speech under the First Amendment, yet was a substantial cause of the Board's decision to terminate him later that year. The Board held a special meeting to discuss Charvat's letter and its position regarding the OAG civil enforcement action. It decided to exclude Charvat from meeting with the OAG and from participating in EORWA's negotiations with the Ohio authorities.

Charvat alleges that the Board, and Board Member Thomas in particular, orchestrated a plan to convince the OAG that the Board was largely ignorant of the extent of EORWA's environmental violations. As part of the plan, the Board made it clear to EORWA employees that they were not permitted to speak directly with the OAG without first gaining approval from the Board. Board Member Thomas admitted that Charvat would have been fired had he approached the OAG with any information regarding EORWA's permit violations. The Board's efforts paid off, literally. The OAG concluded his negotiations with EORWA by imposing a fine of approximately $200,000, rather than the $1.2 million that the OAG had initially sought.

Charvat's efforts to discover, report, and correct regulatory violations created tension among the employees at EORWA. As a result, the Board invited all employees to a meeting to express their complaints about Charvat in August of 1995. Only one employee attended, and his testimony did not constitute a strong complaint against Charvat.

examine "whether the right is so 'clearly established' that a reasonable official would understand that what he is doing violates that right." *Brennan v. Township of Northville*, 78 F.3d 1152, 1154 (6th Cir. 1996) (citation omitted).

The four Board members, Pollock, and Thomas question whether Charvat's reporting of the environmental violations constituted speech protected by the First Amendment, thereby raising a question of law properly reviewable on interlocutory appeal. *See Johnson v. Jones*, 515 U.S. 304, 317 (1995) (holding that the denial of qualified immunity is reviewable on interlocutory appeal only if the case presents "abstract issues of law"). We review the denial of a motion for summary judgment based on qualified immunity de novo. *See Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1010 (6th Cir. 1999).

### 2. Charvat's letters were protected speech because they involved matters of public concern

Even if Charvat has the right to sue under § 1983, the defendants contend that he has failed to state a claim of retaliation under the First Amendment because he has not shown that he was punished for speaking on a matter of "public concern." They further maintain that under *Pickering v. Board of Education*, 391 U.S. 563 (1968), EORWA's interest as a public employer in restraining Charvat's speech outweighs any burden imposed on his rights under the First Amendment. Their position, therefore, is that Charvat has failed to prove that the Board members, Pollock, or Thomas violated a clearly established constitutional right.

This circuit has outlined three elements that form the basis of a § 1983 claim for unlawful retaliation in violation of the First Amendment. These elements are:

(1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely

SDWA whistleblower provisions preclude Charvat from pursuing a remedy under § 1983. The plaintiff in *Bush*, a federal employee, sued his employer, the National Aeronautics and Space Administration (NASA), for damages based on the doctrine of *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971). Given the uniqueness of the *Bivens* remedy, the Supreme Court held that administrative remedies available to federal employees were sufficient to preclude *Bivens* actions for claims based on First Amendment retaliation. It did so, however, in light of the complex regulations applicable to federal employees. *See id.* at 381-88. As such, the holding of *Bush* and its progeny that federal employees cannot pursue damages remedies against their employers for First Amendment retaliation is distinguishable from our analysis under § 1983.

In conclusion, we agree with the district court's holding that the whistleblower provisions of the CWA and the SDWA do not preclude Charvat from bringing suit under § 1983 for alleged retaliation in violation of his protected First Amendment rights.

**B.  The district court properly held that the six individual defendants named in Charvat's suit were not entitled to summary judgment based on qualified immunity**

*1.  Standard of review*

The doctrine of qualified immunity shields government officials from liability, as well as from suit, as long as their official conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A district court must engage in a two-step inquiry when determining whether a state actor is entitled to qualified immunity. First, the court must ask whether the plaintiff in the civil action has demonstrated the violation of a constitutionally protected right. Second, the court must

On August 6, 1995, the Board voted to commence termination proceedings against Charvat. Fifteen grounds were listed to justify termination. The reasons mostly involved complaints about Charvat's management style and his failure to follow orders from the Board. A pre-termination hearing was held by the Board. Board Members Thomas, Tekely, and Lavapies then met on September 6, 1995 in executive session. They voted to terminate Charvat's employment and to name Pollock and another employee as cosuperintendents.

**B.  Procedural background**

Charvat filed a complaint with the Department of Labor (DOL) on October 3, 1995 pursuant to the whistleblower provisions of the CWA and the SDWA. The only named defendant in that action was EORWA. His complaint alleged that EORWA unlawfully retaliated against him for reporting the facility's regulatory violations to EORWA's Board and to OEPA. The DOL's Employment Standards Administration, Wage and Hour Division, found Charvat's complaint to be without merit. Charvat then requested a hearing. A DOL Administrative Law Judge (ALJ) held a series of hearings throughout 1997 on his claim.

On July 20, 1998, the ALJ issued a Recommended Decision and Order, holding for Charvat. The order details at length the testimony of the witnesses that appeared before the ALJ. Charvat presented evidence of the Board's attempts to undermine his efforts at uncovering, reporting, and fixing various regulatory violations at the treatment facility. EORWA offered the testimony of Board Member Wilson and several employees. They claimed that Charvat was ineffective as a superintendent, that he lowered morale among EORWA employees, and that he was insubordinate in not complying with the Board's orders.

The ALJ found that Charvat had met his burden by proving that EORWA's justifications for termination were a pretext to

mask its unlawful motive of preventing Charvat from reporting regulatory violations. As a result of his findings, the ALJ ordered EORWA to reinstate Charvat as superintendent under his original employment terms and to pay Charvat $175,020 in back pay with interest, $5,000 for emotional distress and loss of reputation, $10,000 in exemplary damages, and attorney fees incurred in the litigation before the ALJ. Both parties filed an appeal of the ALJ's decision, a proceeding inexplicably still pending before the DOL.

Charvat also commenced an action in federal court on September 2, 1997 against EORWA and the six named defendants, claiming violations of 42 U.S.C. § 1983 and various state-law provisions. He contends that his termination was in retaliation for the exercise of his First Amendment free-speech rights. EORWA and the four Board members filed a combined answer. Pollock and Thomas jointly filed a separate answer. On February 19, 1998, the district court stayed the case pending the disposition of Charvat's administrative claim before the DOL. The district court lifted the stay once the ALJ issued his order.

Charvat then filed a motion for partial summary judgment, arguing that the ALJ's order was res judicata in his favor on the issues of liability and injunctive relief under § 1983. EORWA, the four Board members, Pollock, and Thomas jointly opposed Charvat's motion. They also cross-moved for judgment on the pleadings, or alternatively, summary judgment on the basis of qualified immunity. Pollock and Thomas filed an additional supplemental motion for summary judgment, arguing in particular their lack of liability because they had no authority to hire or fire Charvat. The district court granted Charvat's motion to amend his complaint by adding a claim for conspiracy under 42 U.S.C. § 1985.

On March 2, 2000, the district court ruled on all of the pending motions. It held that Charvat had stated a viable claim for a First Amendment violation under § 1983, and that the statutory whistleblower provisions providing for

Congress's carefully tailored scheme." *Id.* at 107 (internal quotation marks omitted).

The burden thus lies with the defendant in a § 1983 action to prove preclusion. "[I]f there is a state deprivation of a 'right' secured by a federal statute, § 1983 provides a remedial cause of action unless the state actor demonstrates by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement." *Wright v. City of Roanoke Redevelopment & Hous. Auth.*, 479 U.S. 418, 423 (1987) (holding that the Brooke Amendment to the Housing Act, which provides the Department of Housing and Urban Development with mechanisms to enforce the rights in the Act, does not preclude plaintiffs from also enforcing the Act through suits under § 1983).

In essence, the defendants argue that because Congress has created a federal statutory right to be free from adverse employment action as a result of bringing to light an employer's violations of the CWA and SDWA, the administrative remedies provided by the whistleblower provisions of these Acts should be exclusive. The crucial point, however, is that Charvat's § 1983 suit raises the issue of whether the defendants violated his constitutional right to free speech, not simply whether Charvat suffered from an adverse employment action. This distinction is perhaps best demonstrated by our circuit in the case of *Lillard v. Shelby County Board of Education*, 76 F.3d 716, 722-24 (6th Cir. 1996), which held that Title IX's statutory remedy for claims of discrimination in an educational program receiving federal financial assistance does not preclude plaintiffs from bringing a substantive due process claim under § 1983. In sum, the defendants have failed to prove that Congress intended for the whistleblower provisions of the CWA and SDWA to preclude the enforcement of constitutional rights through § 1983.

Finally, the defendants cite *Bush v. Lucas*, 462 U.S. 367 (1983), in support of their contention that the CWA and

provide for an administrative remedy, with final review available in federal court.

Charvat responds to the defendants' contention by insisting that *English v. General Electric Co.*, 496 U.S. 72 (1990), is directly on point. The plaintiff in *English* filed a complaint with the Secretary of Labor under the whistleblower provision of the Energy Reorganization Act. *See English*, 496 U.S. at 75. She then initiated a separate diversity suit in federal court against her employer, raising state-law claims for wrongful discharge and for the intentional infliction of emotional distress. *See id.* at 77. The Court was faced with the question of "whether the Federal Government has pre-empted petitioner's state-law tort claim for intentional infliction of emotional distress." *Id.* at 78. Because the issue of federal preemption of state law differs from the *National Sea Clammers* question of whether statutory enforcement mechanisms preclude federal suits under 42 U.S.C. § 1983, *English* is not as on point as Charvat claims it to be.

The Supreme Court, however, has narrowed the *National Sea Clammers* doctrine through subsequent caselaw, which leads to the conclusion that the whistleblower mechanisms provided by the CWA and the SDWA do not preclude an employee of a public employer from suing under § 1983 for a violation of his or her First Amendment rights. In particular, the Court has held that "[t]he availability of administrative mechanisms to protect the plaintiff's interests is not necessarily sufficient to demonstrate that Congress intended to foreclose a § 1983 remedy." *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106 (1989) (holding that the National Labor Relations Board's exclusive jurisdiction to remedy unfair labor practices by employers and unions does not preclude a plaintiff from filing suit under § 1983 to protect labor rights under the National Labor Relations Act against governmental interference). "Rather, the statutory framework must be such that allowing a plaintiff to bring a § 1983 action would be inconsistent with

administrative remedies do not preclude him from proceeding with his § 1983 action. Furthermore, it denied the cross-motion for judgment on the pleadings and denied the motions of the six individual defendants for summary judgment on the basis of qualified immunity. Finally, it granted the defendants' motion to dismiss Charvat's conspiracy claims under § 1985.

## II. ANALYSIS

### A. The whistleblower provisions of the CWA and SDWA do not preclude Charvat from pursuing a First Amendment retaliation claim under § 1983

The defendants maintain that there is a threshold question that must be resolved before reviewing whether Charvat has stated a claim under 42 U.S.C. § 1983. They argue that Congress intended to foreclose the type of retaliation suit brought by Charvat under § 1983 by enacting the whistleblower provisions of the CWA and SDWA. In its pretrial order, the district court held that the whistleblower provisions do not preclude Charvat's § 1983 suit.

Although we have jurisdiction only over final judgments of the district court pursuant to 28 U.S.C. § 1291 and specific kinds of interlocutory orders, we retain the discretion to exercise pendent appellate jurisdiction. "The doctrine of pendent appellate jurisdiction allows an appellate court, in its discretion, to exercise jurisdiction over issues that are not independently appealable when those issues are 'inextricably intertwined' with matters over which the appellate court properly and independently has jurisdiction." *Chambers v. Ohio Dep't of Human Servs.*, 145 F.3d 793, 797 (6th Cir. 1998). Because we have proper jurisdiction over the interlocutory appeal by the four Board members, Pollock, and Thomas from the district court's denial of summary judgment based on qualified immunity, and because the threshold question raised is inextricably intertwined with Charvat's

§ 1983 claim, we shall exercise our pendent appellate jurisdiction to review the district court's determination that the whistleblower provisions of the CWA and the SDWA do not foreclose Charvat from pursuing his claim.

The CWA provides an administrative remedy that protects employees who report violations of that Act. It states:

> No person shall fire, or in any other way discriminate against, or cause to be fired or discriminated against, any employee or any authorized representative of employees by reason of the fact that such employee or representative has filed, instituted, or caused to be filed or instituted any proceeding under this chapter.

33 U.S.C. § 1367(a). The section then outlines the procedure for filing a complaint with the Secretary of Labor. A whistleblower provision in the SDWA sets forth the same procedures for administrative remedies for employees covered by that Act. *See* 42 U.S.C. § 300j-9(i). Both statutes provide for a fact-finding investigation and hearing by the Secretary of Labor. The Secretary is then authorized to issue an initial order and grant appropriate relief. These orders are appealable to an ALJ, whose decision may also be appealed to the Administrative Review Board of the DOL. *See* 29 C.F.R. §§ 24.4(d)(2), 24.8(a). Final administrative orders are appealable to the U.S. Court of Appeals in the region where the alleged violation occurred. *See* 33 U.S.C. §§ 1367(b), 1369(b); 42 U.S.C. § 300j-9(i)(3)(A).

The defendants contend that the congressional intent behind the whistleblower provisions contained in the CWA and the SDWA was to create an exclusive remedy that precludes employees such as Charvat from bringing a § 1983 claim in federal court. No legislative history is cited to support their position. Moreover, the statutes are silent on this issue. The defendants claim, however, that their argument is supported by the doctrine set forth in *Middlesex County Sewerage*

*Authority v. National Sea Clammers Ass'n*, 453 U.S. 1 (1981).

In *National Sea Clammers*, individual fishermen and an association of fishermen brought a class action against various federal, state, and local officials for violating regulations under the Federal Water Pollution and Control Act (FWPCA), the Marine Protection, Research, and Sanctuaries Act of 1972 (MPRSA), and other federal environmental statutes. *See id.* at 4. Both of the named statutes have citizen-suit provisions that authorize private persons to sue for injunctions to enforce the requirements of the statute. They also spell out specific procedures for filing such citizen suits. *See id.* at 14. The Court determined that "[i]n view of these elaborate enforcement provisions it cannot be assumed that Congress intended to authorize by implication additional judicial remedies for private citizens suing under MPRSA and FWPCA." *Id.* Furthermore, it stated that "[w]hen the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Id.* at 20. Finally, the Court concluded that "the existence of these express remedies demonstrates not only that Congress intended to foreclose implied private actions but also that it intended to supplant any remedy that otherwise would be available under § 1983." *Id.* at 21.

The *National Sea Clammers* doctrine, however, is not directly parallel to the question of whether the whistleblower provisions of the CWA and SDWA foreclose a § 1983 suit based on the violation of an individual's constitutional rights. First, the plaintiffs in *National Sea Clammers* were suing to enforce substantive rights set forth in the very statutes that provide for citizen suits, whereas Charvat is seeking relief for an alleged violation of his First Amendment rights. Second, the citizen-suit provisions of the FWPCA and the MPRSA create a direct cause of action in federal court, whereas the whistleblower provisions at issue in Charvat's case only