*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0105p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

RONALD FLOYD,

        *Plaintiff-Appellee,*

    *v.*

CITY OF DETROIT, EMMETT QUAINE, and JUAN REYNOSO, JR.,

        *Defendants-Appellants.*

No. 06-2441

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 04-72199—Julian A. Cook, Jr., District Judge.

Argued: September 17, 2007

Decided and Filed: March 6, 2008

Before: BATCHELDER and GILMAN, Circuit Judges; VARLAN, District Judge.[*]

---

## COUNSEL

**ARGUED:** Sheri L. Whyte, CITY OF DETROIT LAW DEPARTMENT, Detroit, Michigan, for Appellants. Victor S. Valenti, FIEGER, FIEGER, KENNEY & JOHNSON, Southfield, Michigan, for Appellee. **ON BRIEF:** Sheri L. Whyte, CITY OF DETROIT LAW DEPARTMENT, Detroit, Michigan, for Appellants. Victor S. Valenti, FIEGER, FIEGER, KENNEY & JOHNSON, Southfield, Michigan, for Appellee.

---

## OPINION

---

    RONALD LEE GILMAN, Circuit Judge. This case arises from an incident in which Detroit police officers Emmett Quaine and Juan Reynoso, Jr. opened fire on Ronald Floyd in his own backyard, wounding him in the chest. Floyd, who was unarmed, claims that the officers fired on him without warning and without cause. He filed this lawsuit, pursuant to 42 U.S.C. § 1983, against the City of Detroit and the two officers. According to Floyd, the officers violated his constitutional rights by using excessive force, and the City is liable for failing to properly train them. All three defendants filed a joint motion for summary judgment.

---

[*] The Honorable Thomas A. Varlan, United States District Judge for the Eastern District of Tennessee, sitting by designation.

The district court denied the motion, finding that genuine issues of material fact precluded the grant of summary judgment. On appeal, Officer Quaine asserts that he is entitled to qualified immunity because his shot missed Floyd, and Officer Reynoso argues that he should receive qualified immunity because he fired under the mistaken but reasonable belief that Floyd had shot Quaine. For the reasons set forth below, we **AFFIRM** the judgment of the district court regarding its denial of summary judgment as to Quaine and Reynoso and **DISMISS** the City's appeal as premature.

## I. BACKGROUND

### A.        Factual background

The issues in this case stem from a series of events that culminated in the nonfatal shooting of Floyd by Detroit police officers on April 18, 2004. At that time, Floyd lived with his girlfriend, Delilah Hargrove, and her young son in the lower level of a two-family residence located at 3739 Whitney Street in Detroit, Michigan. In the early evening hours on April 18, 2004, Floyd and Hargrove left their residence to attended a barbeque held as part of a birthday celebration for Hargrove's sister. Floyd returned home by himself between 6:30 p.m. and 7:00 p.m. to pick up additional food for the barbeque.

Upon arriving back at his house, Floyd discovered that the car belonging to Jerry Wilmer, the upstairs resident of the dwelling, was parked so as to block the makeshift driveway that Floyd had constructed. Floyd had previously asked Wilmer to leave enough space for Floyd to enter the driveway, and this latest transgression prompted Floyd to call up to Wilmer's second floor balcony to complain. Wilmer allegedly responded by picking up an old metal lawn chair and threatening to throw it down at Floyd. Not to be outdone, Floyd armed himself with what he described as a three-foot silver fence pole and warned that he intended to lob the pole at Wilmer if Wilmer threw the chair.

The argument eventually fizzled without an exchange of projectiles. Floyd retrieved the additional food for the barbeque and left soon thereafter. Richard Grant, a high school senior who lived next-door, witnessed the argument from his porch across the vacant lot that separates his house from Floyd's. Grant confirmed in his deposition that the argument took place, but he described the three-foot pole that Floyd claims to have brandished as an object that "looked like a gun." Furthermore, Grant said that Wilmer specifically reproached Floyd for "bring[ing] a gun out," stating that "little as I am, big as you is, you're going to come out here with a gun on me." According to Grant, Wilmer warned Floyd that he was calling the police, to which Floyd allegedly responded "whatever" and then left the scene to return to the barbeque.

Officers Quaine and Reynoso testified in their depositions that Wilmer had followed through with his stated intent to call the authorities by phoning the Detroit police. The officers were told that a complaint had been made concerning "a person with a weapon." Quaine and Reynoso were dispatched to the scene, but they arrived after Floyd had already left the residence to return to the barbeque. Once there, Quaine spoke with Wilmer to get the details of his complaint. According to Quaine, Wilmer explained that Floyd had threatened him with a shotgun in the course of their parking dispute. Wilmer also told Quaine that Floyd had left after brandishing the weapon.

During the course of Officer Quaine's conversation with Wilmer, Floyd and Hargrove returned to their residence in separate vehicles. Hargrove returned first, and Officer Quaine began interviewing her. Shortly thereafter, at approximately 8:00 p.m., Floyd arrived.

Floyd's account of what happened next differs significantly from that of Officers Quaine and Reynoso. According to Floyd, he drove his car to the rear of the house and parked beside his two trucks. The trucks were lined up in a row parallel to the back edge of the property. Floyd testified

that he got out of his car, walked around the back of the truck parked immediately beside it, and then proceeded to walk between the two trucks toward the house. As he walked, Floyd allegedly held his hands out in front of him—above chest level—because he frequently encountered spider webs hanging down from a nearby tree. Floyd contends that he was unarmed and that his hands were empty because he had already placed his keys in his pocket.

As Floyd neared the end of the passage in between the parked trucks, he noticed the officers running toward him because their flashlight beams could be seen in the dusk. A "split second" after Floyd saw the officers, they allegedly began shooting at him without warning. Floyd recalls hearing two shots following in quick succession. He testified that he backed up slightly after hearing the first shot and then began yelling, "I don't have a gun." Officer Quaine admitted in his deposition that he fired the first shot at Floyd, but a ballistics test later confirmed that Quaine's shot missed. Officer Reynoso then fired the second shot. This shot struck Floyd in the upper right portion of his chest.

The account of the shooting given by Officers Quaine and Reynoso differs significantly from Floyd's. Although both officers admitted in their depositions that they approached Floyd with their guns drawn, they denied that they were using their flashlights at the time. The officers also emphasized that they had credited Wilmer's warning that Floyd was armed with a shotgun and had threatened Wilmer with the weapon just hours earlier. Both officers further recalled that Quaine, prior to shooting at Floyd, identified himself as "Detroit Police" and ordered Floyd to "show me your hands."

Officer Quaine asserted in his deposition that he fired at Floyd because he perceived that Floyd was armed with a handgun. He further claimed that Floyd actually fired at Quaine first. Officer Reynoso, in turn, explained that he fired at Floyd because, after hearing the initial shot and seeing Quaine fall to take cover, he mistakenly believed that Floyd had shot Quaine.

Floyd fell to the ground after being hit in the chest by Reynoso's shot, and the officers quickly approached him. The officers immediately asked Floyd "where the gun was." Floyd responded that he had no gun. Upon discovering that Floyd was wounded and unarmed, Officer Reynoso allegedly apologized profusely. Floyd also alleges that, while he lay on the ground wounded, one of the officers reached for a gun in his ankle holster in order to plant it on Floyd. According to Floyd, he foiled this attempt by exclaiming "I see that" and grabbing hold of the trucks on either side of him to prevent the weapon from being placed in his hands. No guns besides the officers' weapons were ever discovered at the scene either that night or after a subsequent search of the premises.

Floyd's neighbor Grant, who had witnessed the initial argument between Floyd and Wilmer, also saw the shooting incident. Although Grant did not see the officers' flashlights turned on before the shooting, he did see them illuminated immediately afterward. He further observed that the officers, upon Floyd's arrival, ran toward the back of the house with their guns drawn. Moreover, Grant agreed with Floyd that neither officer gave any verbal warning before opening fire and that Floyd was unarmed. Grant also corroborated Floyd's testimony that the officers asked "where is the gun" after the shooting occurred.

Unlike the others present at the scene, however, Grant said that he heard the officers fire three shots rather than two. Grant also partially contradicted Floyd's account by recalling that Floyd kept the car keys in one of his hands while walking toward the officers and that he never raised his hands above his waist to swat spider webs. After the shooting, Grant heard one of the officers radio that there was an "officer down."

Officers Quaine and Reynoso quickly summoned Detroit's Emergency Medical Services (EMS) to the scene upon discovering Floyd's wound. EMS arrived a short time later and transported Floyd to a nearby hospital. Floyd was found to have suffered a collapsed lung, with the bullet nicking his liver, but the doctors were able to stabilize him. The bullet remains lodged in Floyd's upper back near his spine and continues to cause him pain.

**B.        Procedural background**

Floyd filed this action in state court against Officer Quaine, Officer Reynoso, and the City of Detroit in May of 2004. His complaint alleges that the officers are liable under 42 U.S.C. § 1983 for violating his constitutional rights under the Fourth and Fourteenth Amendments through their use of excessive force. He also claims that the City of Detroit is liable under § 1983 for failing to properly train the officers concerning the appropriate use of force and for establishing a custom of using excessive force. In addition to these federal claims, Floyd asserts state-law claims against all of the defendants for gross negligence, willful and wanton misconduct, assault and battery, and intentional infliction of emotional distress. The defendants timely removed the case to the United States District Court for the Eastern District of Michigan.

Following discovery, the defendants filed a joint motion for summary judgment. A hearing on the motion was held in September of 2006. The district court ultimately denied the defendants' summary-judgment motion as to all claims except the battery claim against Officer Quaine, whose shot missed Floyd. In its written order, the court explained that genuine issues of material fact precluded summary judgment on the remainder of Floyd's claims. The defendants timely filed this interlocutory appeal.

## II.  ANALYSIS

**A.        Qualified immunity**

### *1.        Standard of review*

This court has jurisdiction over appeals taken from final orders, 28 U.S.C. § 1291, and from appealable interlocutory orders, 28 U.S.C. § 1292. The denial of a summary judgment motion usually presents neither a final appealable order nor an appealable interlocutory order. *Swint v. Chambers County Comm'n*, 514 U.S. 35, 41-43 (1995). But the rejection of a qualified-immunity claim, "to the extent that it raises a question of law," provides an exception to this general rule. *Risbridger v. Connelly*, 275 F.3d 565, 568 (6th Cir. 2002). We thus have jurisdiction to review the officers' claims of qualified immunity, but only insofar as those claims do not raise genuine issues of material fact. *See Johnson v. Jones*, 515 U.S. 304, 319-20 (1995) ("[A] defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial."). Both the district court and the parties have approached the qualified-immunity issue in the present case as a question of whether there are genuine issues of fact for trial. This formulation falls squarely within the prohibition against interlocutory appeals as enunciated in *Johnson*, and we would lack jurisdiction over this appeal if we were to analyze the case as it has been presented to us.

A review of the record, however, demonstrates that the officers' qualified-immunity claims do not require us to consider whether there are genuine issues of fact for trial. We will therefore proceed to analyze their claims under the two-step, sequential inquiry articulated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The threshold question we must address is whether, "in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right[.]" *Id.*; *see also Charvat v. E. Oh. Reg'l Wastewater Auth.*, 246 F.3d 607, 616 (6th Cir. 2001) ("First, the court must ask whether the plaintiff in the civil

action has demonstrated the violation of a constitutionally protected right."). As a general matter, this requires that we "adopt[] . . . the plaintiff's version of the facts." *Scott v. Harris*, 127 S. Ct. 1769, 1775 (2007). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

"On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.*; *see Charvat*, 246 F.3d at 616 (explaining that the court must determine "whether the right is so 'clearly established' that a reasonable official would understand that what he is doing violates that right.") (citation and internal quotation marks omitted). "This inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." *Saucier*, 533 U.S. at 201. A third consideration occasionally examined by this court to "increase the clarity" of the analysis is "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 n.2 (6th Cir. 2005) (citations omitted).

### 2.          *Whether Floyd has asserted a constitutional violation*

The appropriate standard to use in analyzing an excessive-force claim brought under § 1983 "is determined by identifying the specific constitutional right infringed by the challenged application of force." *Lustig v. Mondeau*, 211 F. App'x 364, 369 (6th Cir. 2006) (citing *Graham v. Connor*, 490 U.S. 386, 393-94 (1989)). "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]" *Graham*, 490 U.S. at 395. The first prong of the qualified-immunity analysis—which examines whether the facts, as alleged by Floyd, are sufficient to describe a violation of his right to be free from unreasonable seizure by using excessive force—therefore turns on the reasonableness of the officers' actions.

Officer Quaine attempts to bypass this analysis by arguing that, because his shot missed Floyd, he did not seize Floyd within the meaning of the Fourth Amendment and therefore is entitled to qualified immunity as a matter of law. He goes so far as to argue that "[a]ssuming, arguendo, that Floyd was not armed and posed no immediate threat of death or serious bodily injury to Quaine and that Quaine violated all manner of recognized police procedures by shooting at and missing Floyd, he, nonetheless, did not violate Floyd's rights." As authority for this proposition, Quaine relies heavily on this court's prior statement that "shooting at a fleeing felon, but missing, is not a 'seizure.'" *Adams v. City of Auburn Hills*, 336 F.3d 515, 519 (6th Cir. 2003) (citing *Cameron v. City of Pontiac*, 813 F.2d 782, 785 (6th Cir. 1987)).

Quaine's reliance on *Adams* and *Cameron*, however, is misplaced. The key distinction is that both of those cases involved police firing errant shots at a *fleeing* suspect. In *Cameron*, for example, police officers chased a burglary suspect and shot at him several times, but never hit him. During the course of the ensuing chase, however, Cameron ran onto a busy expressway and was fatally struck by a passing car. The court explained that

> Cameron was not seized by [the officer defendants]. Cameron elected to flee, not to be restrained. The officers' show of authority by firing their weapons, while designed to apprehend Cameron, did not stop or in any way restrain him. Just as clearly, when the pursuit terminated in an accident [causing the death of] the minor plaintiff, he was not restrained by, or as a result of, the officer's show of authority. Cameron's freedom of movement was restrained only because he killed himself by electing to run onto a heavily traveled, high speed freeway.

> The use of deadly force standing alone does not constitute a seizure, and absent an actual physical restraint or physical seizure, the alleged unreasonableness of the officers' conduct cannot serve as a basis for a § 1983 cause of action anchored in the Fourth Amendment.

*Cameron*, 813 F.2d at 785 (citations and quotation marks omitted).

*Adams* involved analogous facts, where police officers shot at and struck a suspect's car as he successfully fled the scene of a domestic dispute after the officers had attempted to detain him. The district court noted that the shots fired by Officer Backstrom at Adams's automobile "did not impair Adams's movement." *Adams*, 336 F.3d at 520. Furthermore, the court emphasized that "Adams was not hit by Officer Backstrom's bullets and was able to leave the scene unharmed despite Backstrom's use of his firearm. Even though the tire of [Adams's vehicle] was hit, it appears that the car still was operable and Adams reached his destination, his mother's house." *Id.*

Unlike the suspects in *Cameron* and *Adams*, Floyd did not flee from Officer Quaine's show of authority. Floyd contends that he in fact halted in his tracks upon hearing Quaine's initial shot and even backed up slightly, quickly yelling, "I don't have a gun." As this court has held, "the various definitions of 'seizure' contained in the precedents connote an intentional interference with a person's liberty by physical force or a show of authority that would cause a reasonable person consciously to submit." *Peete v. Metro. Gov't of Nashville & Davidson County*, 486 F.3d 217, 220 (6th Cir. 2007) (citing *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007) ("A Fourth Amendment seizure occurs . . . when there is a governmental termination of freedom of movement through means intentionally applied." (brackets omitted) (alteration in original))).

The facts as alleged by Floyd demonstrate that Quaine's firing his weapon at Floyd was a show of authority that actually had the intended effect of contributing to Floyd's immediate restraint. Quaine's act therefore amounted to a seizure of Floyd under the above definition. *Cf. Cameron*, 813 F.2d at 785 (concluding that no seizure had occurred as a result of errant shots fired by police officers at a fleeing suspect because the suspect continued to evade arrest and therefore "was *not* restrained by, or as a result of, the officer's show of authority" (emphasis added)). Moreover, Officer Reynoso's subsequent shot, which struck Floyd in the chest, clearly seized Floyd within the meaning of the Fourth Amendment.

Officer Quaine, for his part, asserts that viewing his actions in relation to Reynoso's amounts to an unjustified effort to "bootstrap" Quaine's liability onto that of Reynoso. This court has held, however, that a police officer who *fails* to act to prevent the use of excessive force may still be held liable where "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *see also Smith v. Heath*, 691 F.2d 220, 225 (6th Cir. 1982) (holding that an officer "was directly responsible for and personally participated in the deprivation of the Smiths' constitutional rights" because he "was present while the other officers unlawfully searched the apartment and thereby violated the Smiths' rights").

Furthermore, Officer Quaine did not simply fail to protect Floyd from Officer Reynoso's use of force. Quaine's own use of deadly force escalated the situation by unambiguously signaling that such force was called for. He also participated in the tactical decision that he and Reynoso would confront Floyd in the latter's backyard at dusk by approaching Floyd with their guns drawn, without any verbal warning and, according to Floyd, "running." Under these circumstances, the fortuity that Quaine's shot failed to strike Floyd as the officers apprehended him does not absolve Quaine of responsibility for his participation in the events surrounding Floyd's seizure.

The question remains whether, as described by Floyd, the officers' actions in connection with Floyd's seizure in fact violated his Fourth Amendment rights. We must therefore determine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.

This court has previously held that "the Fourth Amendment prohibits a police officer's use of deadly force to seize an unarmed, non-dangerous suspect." *Sample v. Bailey*, 409 F.3d 689, 696 (6th Cir. 2005) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). "Rather, the use of deadly force is constitutionally permissible only if 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others . . . .'" *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397 (6th Cir. 2007) (quoting *Garner*, 471 U.S. at 11). This court has highlighted three factors of particular relevance in assessing the reasonableness of an officer's use of force: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the police officers or others, and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight. *Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006).

Officers Quaine and Reynoso emphasize that they learned from Floyd's neighbor Wilmer that Floyd had brandished a shotgun in a threatening manner several hours earlier. But according to Floyd, he was never armed, the officers were using flashlights due to the impending darkness, he had his empty hands extended in front of him, and the officers ran around the corner and shot him in his own backyard without warning. The officers' contrary assertion that Floyd was in fact armed and fired first is simply irrelevant to our determination of "whether a constitutional right would have been violated on the facts alleged" by Floyd. *See Saucier*, 533 U.S. at 200. As a matter of law, an unarmed and nondangerous suspect has a constitutional right not to be shot by police officers. *Sample*, 409 F.3d at 696. Furthermore, we conclude that, under the facts as viewed in the light most favorable to Floyd, the officers' use of deadly force to effect Floyd's seizure violated his Fourth Amendment right to be free from such excessive force.

### 3.     *Whether the asserted constitutional right was clearly established*

Having concluded that the facts as asserted by Floyd constitute a constitutional violation, we now proceed to determine whether, in the specific context of this case, Floyd's constitutional right to be free from excessive force was clearly established. *See Saucier*, 533 U.S. at 200. We must consider, in other words, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

The defendants properly concede that a suspect's right to be free from the use of excessive force is clearly established. *See, e.g.*, *Graham*, 490 U.S. at 399 (recognizing that the use of excessive force violates a suspect's Fourth Amendment rights). No further argument on this point is made by Officer Quaine. Officer Reynoso, however, asserts that he is entitled to qualified immunity because he reasonably but mistakenly believed that Floyd had shot Officer Quaine. Reynoso contends that, because he made a purportedly honest mistake of fact, his actions were reasonable as a matter of law. This contention, however, fails to address the true issue regarding Reynoso's actions; namely, whether his mistaken perception and response were themselves reasonable. Plainly, not all mistakes—even honest ones—are objectively reasonable. *See Dawkins v. Graham*, 50 F.3d 532, 534 (8th Cir. 1995) ("[T]he Fourth Amendment's allowance for officers' honest mistakes is limited to mistakes that are objectively reasonable." (citing *Maryland v. Garrison*, 480 U.S. 79, 87 & n.11 (1987))). The bare assertion that Reynoso allegedly formed an honest but mistaken belief thus does little to resolve the key issue of whether his belief and subsequent actions were nonetheless objectively unreasonable.

Officer Reynoso claims that he followed behind Officer Quaine as the pair rounded the back corner of Floyd's house with their guns drawn. The next thing Reynoso heard was Quaine's gunshot. Reynoso testified that, as he came around behind Quaine, he saw Quaine slump down and to the side to take cover. This, Reynoso asserts, caused him to believe that Quaine had been shot by Floyd. Floyd alleges that Reynoso responded by immediately firing a shot at Floyd while looking "only at [Floyd's] body" and never at his hands.

Under Floyd's version of the facts, moreover, he still had his hands up and was not moving toward the officers after Officer Quaine's shot missed. Officer Reynoso does not explain how any reasonable officer could have formed a belief that Floyd—an unarmed man with his empty hands allegedly up—had shot Quaine. As Floyd points out, Reynoso never claimed that he saw a muzzle flash or even that he saw Floyd with a gun. Furthermore, Reynoso did not allege that he saw blood on Quaine or that he heard Quaine indicate in any way that he had been shot. Reynoso's purported belief that Quaine had been shot by an unarmed suspect, therefore, rested solely on Reynoso's observation of Quaine taking cover.

Officer Reynoso nevertheless attempts to demonstrate the reasonableness of his actions by relying on the Supreme Court's acknowledgment that an officer's action must be viewed in the context of "split-second" judgments made under circumstances that are "tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396-97. But the failure of both officers to properly assess the reality of the situation they created before employing deadly force without warning against an unarmed suspect cannot shield them from liability unless that failure was objectively reasonable. Indeed, even apart from Reynoso's initial belief that Quaine had been shot, Reynoso concedes that he shot at Floyd without ever seeing Floyd's hands. Had Reynoso looked at Floyd's hands even momentarily before shooting him in the chest, he would presumably have seen that Floyd was unarmed. Reynoso's argument on this score thus does little to bolster his assertion that his decision that deadly force was necessary was reasonable under the circumstances.

With respect to the reasonableness of his decision, the following excerpt from Reynoso's deposition is telling:

> Q.     Now, when you shot Mr. Floyd, I should say before you shot Mr. Floyd, at that time, likewise, you did not give him any verbal instructions?
> A.     No.
> Q.     In fact, you were unaware whether your partner shot at him or he shot at your partner, you didn't know either way, did you?
> A.     No.
> Q.     In fact, at that time, you didn't even know it was Mr. Floyd, did you?
> A.     No.
> Q.     It could have been anybody?
> A.     Right.
> Q.     And when you shot him, you never saw him being armed in any way, did you?
> A.     I didn't have a chance to look at his hands.
> Q.     Right. You shot before you looked at his hands, didn't you?
> A.     Yes.
> Q.     So at that particular time, you didn't know who this person was and whether they were armed or not, true?
> A.     True.
> Q.     You shot because you heard a previous shot and you were afraid that this person might be armed?
> A.     Yes.

Q.      And yet you didn't see that person take any threatening action toward you or your partner, did you?
A.      No.

Even taking into account the fact that the officers were dispatched to Floyd's home with a warning that the suspect had earlier been armed, we cannot say that Officer Reynoso's alleged actions were reasonable as a matter of law. To the contrary, we believe that his purported conduct was patently *unreasonable*. According to the facts that we must consider at this stage of the proceedings, the officers ran around the corner of the house with their guns drawn, spotted Floyd in the diminished light, and shot him without (1) announcing themselves as police officers, (2) ordering him to surrender, or (3) pausing to determine whether he was actually armed.

Based upon the facts as construed in the light most favorable to Floyd, we conclude that his right to be free from such excessive force was clearly established on the date in question. Neither officer is therefore entitled to qualified immunity as a matter of law.

## B.      Floyd's pendent state-law claims against the officers

The officers also claim that the district court erred in concluding that they were not entitled to governmental immunity from Floyd's pendent state-law claims. Because the denial of governmental immunity under Michigan law constitutes a "final order," we have jurisdiction to review the officers' interlocutory appeal of the district court's denial of summary judgment on these grounds. *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 408 (6th Cir. 2007) (explaining that since Michigan's court rules were amended to expand the definition of a final order, "we have held repeatedly that, because the denial of governmental immunity is now a 'final order' providing defendants with an appeal of right to the Michigan Court of Appeals, this court has jurisdiction over interlocutory appeals concerning pendent state law claims of governmental immunity.").

The employee provision of Michigan's governmental-immunity act provides in pertinent part as follows:

Each . . . employee of a governmental agency . . . shall be immune from tort liability for injuries to persons or damages to property caused by the . . . employee . . . while in the course of employment . . . while acting on behalf of a governmental agency if all of the following are met:

(a) The . . . employee . . . is acting or reasonably believes he or she is acting within the scope of his or her authority.

(b) The governmental agency is engaged in the exercise or discharge of a governmental function.

(c) The . . . employee's . . . conduct does not amount to gross negligence that is the proximate cause of the injury or damage. As used in this subdivision, "gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.

Mich. Comp. Laws § 691.1407(2). The Michigan Supreme Court has explained that, to survive "summary disposition of a gross negligence claim against a government employee," the plaintiff "must adduce proof of conduct 'so reckless as to demonstrate a substantial lack of concern for whether an injury results.'" *Maiden v. Rozwood*, 597 N.W.2d 816, 824 (Mich. 1999) (emphasis added) (quoting Mich. Comp. Laws § 691.1407(2)(c)).

In the present case, no question has been raised as to whether Officers Quaine and Reynoso were acting within the scope of their authority and engaged in the discharge of a governmental function. We must determine, however, whether Floyd has adduced sufficient evidence to raise a genuine issue of material fact as to whether the officers' conduct amounted to gross negligence. *See id.* at 825-27 (concluding that a staff member at a state mental health facility was entitled to governmental immunity because "reasonable minds could not agree" that his conduct was grossly negligent and explaining that the plaintiff "failed to meet her burden to come forward with specific facts to support her claim"). In so doing, we must view the facts in the light most favorable to Floyd and draw all legitimate inferences in his favor. *See Jackson v. County of Saginaw*, 580 N.W.2d 870, 872 (Mich. 1998) (holding that, even after drawing all reasonable inferences in favor of the plaintiff, "reasonable minds could not differ in concluding" that a jail physician's failure to diagnose the plaintiff's throat cancer "could not amount to gross negligence as defined in the statute").

We believe that Floyd has met his burden under Michigan law. Again, accepting Floyd's version of the facts and drawing all inferences in his favor, both officers used deadly force against him without warning, despite the fact that he was in his own backyard and posed no danger to anyone. Reasonable minds could easily conclude that the officers' conduct was so reckless as to demonstrate a substantial lack of concern for whether Floyd would be injured. This would constitute gross negligence under Michigan law. Summary judgment on Floyd's state-law claims is therefore inappropriate.

## C.       City of Detroit's appeal

The City is not entitled to invoke the defense of qualified immunity under federal law, and thus would ordinarily have no grounds to seek an interlocutory appeal of the district court's denial of its motion for summary judgment. *See Swint v. Chambers County Comm'n*, 514 U.S. 35, 43 (1995) (holding that a local government's assertion that the constitutional violation at issue did not result from its policies or customs was not an immediately appealable claim for immunity, but rather only a defense to liability). It contends, however, that we should invoke pendent appellate jurisdiction, which permits the consideration of otherwise unappealable claims "where the appealable and non-appealable issues are 'inextricably intertwined' such that we, in our discretion, decide to extend our jurisdiction over the municipal claim." *Bultema v. Benzie County*, 146 F. App'x 28, 38 (6th Cir. 2005) (quoting *Brennan v. Township of Northville*, 78 F.3d 1152, 1157 (6th Cir.1996)). *Bultema*, however, actually illustrates why the opposite result is appropriate here.

This court in *Bultema* reviewed prior cases in which it had accepted pendent appellate jurisdiction and distinguished them all on the basis that, in those cases, the court had found that no constitutional violation had occurred at all. *Id.* at 37. Where a court determines that no violation of the plaintiff's constitutional rights occurred, obviously the governmental entity cannot be liable for its failure to train or for developing a custom that led to a constitutional violation. Once a violation is determined to have occurred, however, the question of municipal liability turns not simply on the actions of the individual state actors, but rather on the separate question of whether the violation may be attributed to a municipal policy or failure to train. *Id.* at 38. That question, *Bultema* held, was "not indisputably coterminous with, or subsumed in" the question of the individual defendants' entitlement to qualified immunity. *Id.* at 39.

The same result obtains here. Because a jury could find that Officers Quaine and Reynoso violated Floyd's rights, the question of the City's liability under both § 1983 and state law turns on the separate issues of its training practices and policies. Pendant jurisdiction is thus inapplicable, meaning that we lack jurisdiction to consider the City's interlocutory appeal.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court regarding its denial of summary judgment as to Officers Quaine and Reynoso and **DISMISS** the City's appeal as premature.