NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0415n.06

Case No. 15-3485

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jul 25, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| BERNADETTE ROLEN, Administratrix of the Estate of Daniel Ficker; TIFFANY URBACH, | ) ) ) ) | |
| Plaintiffs-Appellees, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF |
| v. | ) ) | OHIO |
| CITY OF CLEVELAND; MATTHEW CRASKA; DAVID MINDEK, | ) ) ) | OPINION |
| Defendants-Appellants. | ) | |

BEFORE: KETHLEDGE, DONALD, and ROTH,[*] Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** Plaintiffs-Appellees Bernadette Rolen (as Administratrix of the Estate of Daniel Ficker) and Tiffany Urbach filed this lawsuit against Defendants-Appellants the City of Cleveland (the "City") and Cleveland police officers Matthew Craska and David Mindek for alleged violations of state and federal rights based on a series of events that ultimately led to the death of Daniel Ficker. The district court denied the defendants' motions for summary judgment, reasoning that there were genuine issues of material fact present for each claim and that the defendants were not entitled to qualified or statutory immunity. Both defendants appeal, asserting that they are entitled to qualified immunity on the plaintiffs'

---

[*] The Honorable Jane Roth, Circuit Judge for the United States Court of Appeals for the Third Circuit, sitting by designation.

42 U.S.C. § 1983 claims as well as statutory immunity on the plaintiffs' state law claims. We **AFFIRM** in part, **DISMISS** in part, and **REMAND** to the district court for further proceedings consistent with this opinion.

## I.

### A. The Plaintiffs' Version of the Facts

On the afternoon of July 3, 2011, Tiffany Urbach ("Urbach"), Daniel Ficker ("Ficker"), and their children attended a Fourth of July party at the home of Urbach's cousin, Kim Mindek ("Kim"), in Cleveland, Ohio. Urbach and Ficker spoke with Kim about the layout of her house, but Kim failed to mention that the upstairs was off limits to party guests. Urbach and Ficker spent their time in the backyard with friends and family, except for the one time Ficker entered the house to check on the kids. (R. 46-2, PageID #1317.) Eventually, Urbach, Ficker, and their children left the Mindeks' to attend another Fourth of July party at Urbach's mother's home. Around 10:00 p.m., Urbach and Ficker said goodnight to their children, who were spending the night with Urbach's mother, and met a friend at a local bar for about an hour. Urbach and Ficker had one or two alcoholic drinks at the first party, nothing to drink at the second party, and two drinks at the bar.

Sometime after Urbach and Ficker left Kim's party, Kim discovered that her wallet and debit card were missing from her upstairs bedroom. She called her husband, David Mindek ("Mindek"), an on-duty Cleveland police officer, sometime between 10:00 and 10:30 p.m. to inform him of the apparent theft. Mindek left his shift and began driving home. On his way, he called Matthew Craska ("Craska"), a fellow Cleveland police officer with whom he had a personal relationship, and explained that there had been a party at his house and that some personal items were missing.

Craska, who was on-duty, proceeded to the Mindeks' home. When he arrived, Kim told him that she had explained to her guests that the upstairs of the house was off limits and that she had only seen Ficker go upstairs. She also said that when she confronted Ficker about being upstairs, he had explained that he was interested in the layout of the house.

Shortly thereafter, Mindek arrived at the house and discussed the situation with both his wife and Craska. He informed Craska that Ficker had stolen from the family before and that he was a convicted felon with a weapons charge. Based on this information, Craska asked his police dispatcher to verify Ficker's criminal history, but the search was unsuccessful.[1] After this preliminary investigation, Craska and Mindek decided to travel to Ficker and Urbach's house in Parma, a suburb of Cleveland, to question him about the theft. Craska's superior at the Cleveland Police Department granted him permission to travel to Parma and gather more information for a report.

The officers arrived at Ficker's house shortly before Urbach and Ficker pulled into the driveway. Urbach observed Mindek standing on the lawn next to a tree and Craska standing by his zone car[2] on the street. Urbach parked in the driveway. As she and Ficker exited the car, Urbach asked Mindek what he was doing at their house. Mindek began yelling at the couple about the missing property, alleging that Ficker took it.

Craska remained silent as he stood by his zone car. Urbach and Ficker met at the back of their car and began walking towards their house. Urbach asked Mindek to leave and said that she and Ficker did not have any of the stolen property. The pair also told the officers that they did not wish to speak to them. As Urbach reached the top step of her porch and attempted to enter the side door, she felt Ficker jerk away from her, and she turned around to see Craska

---

[1] Unbeknownst to him at the time, Craska had spelled "Ficker" wrong.
[2] "Zone car" is slang for a police cruiser.

forcing Ficker towards the zone car. While Craska shoved Ficker up against the trunk of the car, Urbach walked over to Mindek, who was still standing on the lawn near her car, and asked him to tell Craska to stop. Ficker began yelling, calling out to his neighbors for help and to observe the officers' conduct. Craska proceeded to search Ficker, finding a pocketknife, which he threw to the side.

While Craska searched Ficker, Mindek demanded Urbach give him the keys to her car so he could search it. Urbach threw her keys at him, told him to search it, and explained that he would not find anything inside the car. Frustrated with the situation, Urbach called a friend who was a Parma police officer and then her local police department's non-emergency line to ascertain whether Craska, as a Cleveland police officer, could question someone outside of his jurisdiction. She paced back and forth between the fence and her car while she spoke on the phone. Her view of Craska and Ficker was obstructed, and she did not see or hear the subsequent interactions between the two.

Meanwhile, Craska attempted to shove Ficker into the zone car, while Mindek removed Ficker's hand from the car. Ficker resisted, grazing Craska's chest with his elbow. In response, Craska punched Ficker in the face and took him to the ground in an armbar.[3] Craska informed Ficker that he was under arrest for assaulting a police officer, and the pair began wrestling. Ficker managed to lock his legs around Craska's head, at which point Mindek grabbed Ficker's legs. Mindek also attempted to handcuff Ficker and eventually succeeded at getting one handcuff on Ficker's wrist. At some point, Craska choked Ficker. As the fight continued, Ficker attempted to break free from Craska's grasp and stand up a few times. Eventually, he succeeded and moved several feet away from Craska. Without saying

---

[3] This grappling technique often employed by law enforcement incapacitates a suspect by grabbing his arm and using leverage to hyperextend the suspect's elbow joint. *See Jiggets ex rel. S.J. v. Long*, 510 F. App'x 278, 281 (4th Cir. 2013).

anything, Craska then pulled out his Taser and deployed it in Ficker's direction. Ficker windmilled his arms, attempting to stop the prongs from hitting him. He subsequently removed the one prong that hit his chest. Craska threw his Taser to the side and again moved towards Ficker. The pair fell to the ground and continued wrestling each other. Ficker grabbed Craska's radio cord as the two struggled.

Mindek then warned Craska that he thought Ficker was trying to reach for Craska's gun. In response, both Craska and Mindek put their hands on the gun, in an attempt to keep it in the holster. It was unclear if Craska knew whether Mindek or Ficker had their hand on the gun. Craska then released the gun from the holster and held it behind his back. Ficker escaped Craska's hold and backed away. Craska moved the gun to his hip and fired a shot towards Ficker, who was less than a foot away. Urbach heard the gunshot and turned around to find Ficker on the ground, a few feet away from the side entrance of the house. She called 911, and Ficker was pronounced dead later that night.

## B. The Defendants' Version of Events

On July 3, Urbach and Ficker attended a party at the Mindeks' home. Kim Mindek told her party guests, including Urbach and Ficker, that the upstairs of the house was off limits to guests. At some point during the party, Kim saw Ficker coming down the stairs from the second floor, and she confronted him. According to Kim, Ficker did not have a good excuse for being upstairs and was very nervous. She explained that Ficker "was fidgeting around in his pockets . . . as if he was trying to hide stuff." Still, Kim did not think much of it at the time, as she did not spend much time indoors during the party. She also was unsure if anyone else had been upstairs.

After Urbach and Ficker left the party, Kim discovered the theft. She called Mindek, who was on duty. Mindek left his shift and drove home. While he was on his way, Mindek called Craska, asking to file a report about the stolen personal items. Craska did not initially answer, so Mindek left a message.

When Craska returned the call, Mindek explained that there had been a party at his house and that personal items were missing. Craska departed for the Mindeks' home, arriving before Mindek. He pulled up to the curb and radioed his dispatcher for a report number to use as Kim walked outside to meet him. He spoke with Kim, who relayed her encounter with Ficker.

Mindek then arrived at the house and informed Craska that Ficker had stolen from the family before and that he had a previous conviction for a weapons charge. Armed with these minimal facts, Craska excused himself and called his police dispatcher to verify Ficker's criminal history, but the dispatcher's search was unsuccessful. Craska decided to drive to Ficker's house to continue his investigation. He asked Mindek if he wanted to accompany him to speak with Ficker, even though he "didn't have much information to go on." R. 39-1, PageID #393. Craska reasoned that Mindek could provide backup, identify Ficker, and identify the missing items. Once Mindek agreed, Craska asked for and received permission from the Cleveland Police Department to travel to Parma to continue his investigation.

Arriving in Parma before Urbach and Ficker, Craska and Mindek knocked on the front and side doors, attempting to see if Urbach and Ficker were home. Shortly thereafter, Urbach and Ficker pulled into the driveway. When they exited their car, Ficker told Craska he did not want to answer any questions, but Craska responded that he needed to pat him down. Craska then grabbed Ficker by the arm and escorted him to the zone car. During the pat down, Craska discovered a pocketknife and tossed it towards Mindek, who was standing on the

lawn. Simultaneously, Urbach told Mindek that he could search her car for the stolen property. Craska heard her and concluded that he had consent to search her vehicle. Mindek took the keys from Urbach and opened the car door and the glove box, but he stopped when he heard Ficker start to yell.

During the pat down, Ficker began pushing off the car and started yelling to his neighbors to "come on out." Craska opened the door to the back of the zone car and asked Ficker to have a seat. In response, Ficker braced himself in the doorframe of the car. Craska again asked Ficker to have a seat, but Ficker said, "No, fuck you." At some point, Mindek walked over to help Craska handle Ficker. In an attempt to get Ficker to sit down in the car, Mindek removed Ficker's arm from the car door, and Craska leaned into him with his hip. Instead of sitting down, Ficker struck Craska on his breastbone.

In response, Craska punched Ficker in the face and took him to the ground in an armbar. As the pair began wrestling, Mindek grabbed Ficker's legs to aid Craska in securing Ficker. Ficker, meanwhile, attempted to break free from Craska's grasp and stand up a few times. Eventually, Ficker succeeded, throwing a few punches in Craska's direction as he backed away. Craska was still kneeling on the ground.

Craska then pulled out his Taser, aiming it at Ficker. He instructed Ficker to get on the ground, but Ficker assumed a fighting stance, stating, "No, fuck you." After several more warnings, Craska deployed his Taser. Hit by the Taser's prongs, Ficker staggered backward several feet towards the sidewalk. He regained his balance and removed the prongs from his chest. Craska again informed Ficker that he was under arrest and needed to get on the ground. Ficker refused, stating, "Nope, fuck you. Let's go." Craska moved towards Ficker, and the two began wrestling again. Both threw punches, and Ficker head-butted Craska on the side

of his head. Mindek attempted to help by handcuffing Ficker, but he was unsuccessful. Craska attempted to call for help on his radio; however, Ficker grabbed it and started whipping Craska with the radio's microphone. At some point, Ficker head-butted Craska again. Mindek was still trying to grab Ficker's hands to subdue him. Ficker, who was on his back, managed to lock his legs around Craska's head. Mindek then informed Craska that Ficker was reaching for Craska's gun. Craska reached down and felt the retention flap of his holster undone. He knocked Ficker's hand away from his holster and pushed himself out of Ficker's leg lock. Mindek was also reaching for the gun, attempting to push it down in the holster. Ficker attempted to choke Craska with his hands. He then kicked Mindek, who fell over.

At some point, Craska's glasses had fallen off, and he now struggled to see. Still on the ground, Craska took the gun out of the holster and placed it behind his back. With one hand, he shoved Ficker, who stood up and backed away from Craska. Craska began to lose consciousness, but he aimed his gun at Ficker, explaining, "If you don't quit going for my gun, that's it. You're gonna die. You gotta stop. You're under arrest. Knock it off." Ficker once again assumed a fighting stance and proceeded to throw a punch at Craska. Craska believed that Ficker was approximately five feet away from him when he discharged his weapon, but he admitted that physical evidence showed that Ficker was less than a foot away. When Mindek heard the shot, he was attempting to stand up and turn around after being kicked. He did not see Craska pull the trigger.

Ficker fell and landed on the walkway leading up to the side door. After hearing the shot, Urbach went to his side. Craska called for help from his dispatcher, who contacted the Parma police department. The Parma police arrived within a matter of minutes.

## C. Procedural History

Bernadette Rolen, in her capacity as Administratrix of the Estate of Daniel Ficker, and Urbach brought suit against Craska, Mindek, and the City of Cleveland. They asserted (1) a civil rights claim against Craska and Mindek under 42 U.S.C. § 1983, for violations of Ficker's Fourth and Fourteenth Amendment rights; (2) claims against the City for failure to train, monitor, and supervise its officers and for failure to implement adequate policies; and (3) state law claims for willful, wanton, and reckless conduct, assault and battery, false arrest, intentional infliction of emotional distress on behalf of Urbach, wrongful death, and survivorship.

After the district court dismissed the state law claims against the City, the defendants all separately filed motions for summary judgment, which the district court denied. The court found that there was a genuine dispute of material fact surrounding the investigatory stop as well as the attempted arrest of Ficker. The court also concluded that a reasonable jury could find in favor of the plaintiffs' on their deadly force claim against Craska, their failure to intervene claim against Mindek, and their state law claims against both officers. The district court then denied both qualified and statutory immunity for those claims.

## II.

### A. Jurisdiction

Ordinarily, we lack jurisdiction over an appeal of a denial of a motion for summary judgment. *Summers v. Leis*, 368 F.3d 881, 886 (6th Cir. 2004). However, the "denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment" from the district court. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). As such, "the defendant[s] must be prepared to overlook any factual dispute and to concede an interpretation of

the facts in the light most favorable to the plaintiff[s'] case." *Berryman v. Rieger*, 150 F.3d 561, 562 (6th Cir. 1998). "Cases fitting that bill typically involve . . . disputes about the substance and clarity of pre-existing law." *Ortiz v. Jordan*, 562 U.S. 180, 190 (2011) (citing *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996)).

Thus, we have jurisdiction over public officials' claims to the extent that they claim that their conduct did not violate a constitutional right and did not violate clearly established law. *See v. City of Elyria*, 502 F.3d 484, 489-90 (6th Cir. 2007); *see also Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014); *Diluzio v. Vill. of Yorkville*, 796 F.3d 604, 610-11 (6th Cir. 2015) (differentiating between an appellant's reviewable and unreviewable challenges).

At the same time, we lack jurisdiction when the party appealing directly challenges "the plaintiff's allegations (and the district court's acceptance) of 'what [actually] occurred[ ] or why an action was taken or omitted,' who did it, or 'nothing more than whether the evidence could support a [jury's] finding that particular conduct occurred.'" *McDonald v. Flake*, 814 F.3d 804, 813 (6th Cir. 2016) (alteration in original) (citations omitted). "Even if a defendant refuses to concede all of the plaintiffs' facts," *Zulock v. Shures*, 441 F. App'x 294, 300 (6th Cir. 2010), and even if "the district court couched its ruling in terms of factual disputes," *Dorsey v. Barber*, 517 F.3d 389, 394 (6th Cir. 2008), we still have jurisdiction over the question of qualified immunity. *See Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005) (noting that disregarding the factual disputes "obviat[es] the need to dismiss the entire appeal for lack of jurisdiction"). In other words, we have jurisdiction to the extent that we can analyze the legal question without relying on disputed facts. *See Thompson v. Grida*, 656 F.3d 365, 368 (6th Cir. 2011) (dismissing the interlocutory appeal because "[t]he officers' arguments for qualified immunity all hinge on acceptance of their version of the facts").

**B. Standard of Review**

We review interlocutory appeals of denials of summary judgment regarding immunity *de novo*. *Summers*, 368 F.3d at 885. Motions for summary judgment are granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when, assuming the truth of the non-moving party's evidence and construing all inferences from that evidence in the light most favorable to the non-moving party, there is sufficient evidence for a trier of fact to find for that party." *Murray-Ruhl v. Passinault*, 246 F. App'x 338, 342 (6th Cir. 2007).

**C. Qualified Immunity**

"Qualified immunity is an affirmative defense that generally shields government officials from suit under § 1983 for their discretionary actions." *Cummings v. City of Akron*, 418 F.3d 676, 685 (6th Cir. 2005). "An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was 'clearly established' at the time of the challenged conduct." *Plumhoff*, 134 S. Ct. at 2023 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). Whether an officer is entitled to qualified immunity requires a plaintiff to demonstrate "(1) that the official violated a statutory or constitutional right, and (2) that right was clearly established." *al-Kidd*, 563 U.S. at 735; *see Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "If *no* reasonably competent officer would have taken the same action, then qualified immunity should be denied; however, 'if officers of reasonable competence could disagree on [the legality of the action], immunity should be recognized.'" *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (alteration in

original). The plaintiffs have the burden of demonstrating that the defendants are not entitled to qualified immunity. *Dorsey*, 517 F.3d at 395 (6th Cir. 2008).

### III.

We address two preliminary issues at the outset. First, the plaintiffs claim that we lack jurisdiction over this entire appeal due to the defendants' failure to concede the facts in the light most favorable to the plaintiffs, an argument the defendants fervently deny.[4] Thus, we determine whether we have jurisdiction over each issue in turn.

Second, the defendants argue that the district court failed to analyze Mindek's conduct separately from Craska's during the initial investigatory stop. *See Krutko v. Franklin Cnty.*, 559 F. App'x 509, 511-12 (6th Cir. 2014) (concluding that where a district court does not conduct a review of an officer's individualized actions, remand for that consideration is warranted). They suggest that the district court concluded that both Craska and Mindek were without authority to conduct the investigatory stop, but the section title only relates to Craska.

Throughout its opinion, the district court acknowledged Mindek's role during the initial seizure—namely, that he put his hands on Ficker in an attempt to get him into the zone car. *See, e.g.*, R. 54, PageID #1664, 1669. Even if the section titles could have been clearer,[5] the district court did not conclude, as a group, that Craska and Mindek were not entitled to qualified immunity based on their collective actions. *See Krutko*, 559 F. App'x at 511. Instead, the

---

[4] Despite this denial, the defendants oddly dedicate a portion of their Reply Brief to a section entitled, "Appellees Grossly Misstate the Undisputed Facts." Reply Br. 1. We have previously noted that merely stating that one has conceded the facts is insufficient to establish jurisdiction. *See Berryman*, 150 F.3d at 564. "Once a defendant's argument drifts from the purely legal into the factual realm and begins contesting what really happened, our jurisdiction ends and the case should proceed to trial." *Id.* at 564-65. We remind defendants who wish to bring interlocutory appeals based on qualified immunity that "a defendant will have a solid jurisdictional position if the defendant claims that the plaintiff cannot show a violation of the clearly established law even assuming everything alleged is true." *Id.* at 564.

[5] Indeed, if we were only to rely on section titles, then it appears the defendants would have us consider whether they had probable cause to place *Mindek* under arrest. *See* Reply Br. 18 ("Defendants possessed probable cause to place Mindek under arrest[.]").

language the defendants reference refers to the district court's conclusion that both officers were acting outside the scope of their employment. *See* R. 54, PageID #1661. The district court's ultimate conclusions refer to each officer separately, and the court engaged in an individualized assessment of each officer's conduct. *See, e.g.*, *id.* ("For these reasons, the court finds that Craska has failed to meet his burden on this argument."). Thus, the district court did not err.

## A. Investigatory Frisk

We first address whether we have jurisdiction over, and whether Craska is entitled to qualified immunity as to, the plaintiffs' claim that Craska violated Ficker's Fourth Amendment clearly established rights when he conducted an investigatory frisk of Ficker. Craska argues that he had sufficient information to justify a *Terry* frisk based on (1) Ficker's previous weapons conviction and (2) his observation that Ficker was severely intoxicated and that Ficker was becoming aggressive.[6] Appellants' Br. 25; Reply Br. 7. He also claims that he "recognized approaching a person with questions about a theft could create a volatile situation." Appellants' Br. 26. The plaintiffs, on the other hand, claim that Ficker's criminal background was unverified. They further allege that although Ficker had been drinking, he was not severely intoxicated. Lastly, they dispel any assertion that Ficker was violent or aggressive before Craska grabbed him. In fact, they claim that both Ficker and Urbach told the officers that they did not wish to speak to them and that the couple was attempting to enter their home when Craska forcefully intervened.

---

[6] Craska also attempts to rely on the fact that he found a pocketknife on Ficker during his search to justify the search itself. Appellants' Br. 28; Reply Br. 7. He further states, "Ficker turned out to be exactly the type of person law officer's fear when they are concerned enough about officer safety to perform a pat down." Appellants' Br. 28. However, this post-hoc claim does not and should not affect whether an officer has, before the search, specific articulable facts indicating a belief that an individual is presently armed and dangerous. *See United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011) (stating that "reasonable suspicion to make a stop cannot be justified by facts that become apparent only after a seizure").

Law enforcement officers may interact with individuals during a consensual encounter "without any objective level of suspicion." *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997). When officers wish to engage in a non-consensual encounter, it rises to the level of an investigative detention. *Id.* The Fourth Amendment allows an officer to conduct an investigatory stop of an individual if they have reasonable suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 30-31 (1968). To conduct a protective frisk of an individual, an officer must further believe "that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or others." *Id.* at 24. Whether a *Terry* frisk is constitutional depends on the validity of the initial *Terry* stop. Officers must have reasonable suspicion to conduct a close-proximity investigation *before* they are entitled to conduct a protective frisk. *See Adams v. Williams*, 407 U.S. 143, 146 (1972) ("So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to [a] protective purpose."); *see* Wayne R. LaFave, 4 Search & Seizure § 9.6(a) (5th Ed.) (explaining that "a frisk for self-protection cannot be undertaken when the officer has unnecessarily put himself in a position of danger by not avoiding the individual in question").

On appeal, Craska only argues that he is entitled to qualified immunity for frisking Ficker and not for the stop itself.[7] (Appellants' Br. 25 ("Due to these two factors, Craska reasonably determined that he should make a brief investigatory detention to pat Ficker down for officer safety purposes.")). Because he has not set forth a basis for constitutional authority to conduct an investigatory stop of Ficker, Craska cannot demonstrate that he was entitled to conduct a

---

[7] Craska argues that, pursuant to *United States v. Thomas*, 77 F. App'x 862, 864 (6th Cir. 2003) (explaining that "a seizure does not occur until the suspect is actually detained"), there was no seizure because Ficker was never actually detained, in that he was not secured in the zone car. Appellants' Br. 27-28. To the contrary, a *Terry* pat down constitutes a "seizure" within the meaning of the Fourth Amendment. *See Terry*, 392 U.S. at 30-31.

protective frisk. Since our analysis of this issue is not conditioned on any the disputed facts, we have jurisdiction and deny Craska qualified immunity.

## B. Arrest

We next address whether we have jurisdiction over, and whether Craska is entitled to qualified immunity for, his attempted arrest of Ficker. The briefs suggest that the parties disagree regarding if and when Ficker was arrested for Fourth Amendment purposes.[8] Craska asserts that he arrested Ficker after Ficker's elbow hit him and that, up until that moment, he had not used excessive force. Instead, he claims that prior to that moment, he "had used [the] bare minimum levels of force" and "merely guid[ed] Ficker from Ficker's car to [the] zone car." Appellants' Br. 31.

On the other hand, the plaintiffs argue that the *Terry* stop and frisk ripened into an arrest without probable cause. They also assert that Craska was more aggressive than he suggests: "grabbed Ficker, dragged him backwards, and slammed him against the car." Appellees' Br. 33.

Whether the investigatory stop and frisk ripened into arrest depends on whether Craska's use of force "was reasonably related to the *Terry* stop's purpose." *Feathers v. Aey*, 319 F.3d 843, 852 n.2 (6th Cir. 2003) ("Although the *Terry* stop was invalid, we nonetheless must look to it in determining the point at which the stop escalated into an arrest."). We consider three factors when determining whether a stop rises to the level of an arrest: "the length of the detention, the manner in which it is conducted, and the degree of force used." *Smoak v. Hall*, 460 F.3d 768, 781 (6th Cir. 2006).

---

[8] Craska relies heavily on *City of Columbus v. Fraley*, 324 N.E.2d 735, 740 (Ohio 1975), for the proposition that "in the absence of excessive or unnecessary force by an arresting officer, a private citizen may not use force to resist arrest by one he knows, or has good reason to believe, is an authorized police officer engaged in the performance of his duties, whether or not the arrest is illegal under the circumstances." However, *Fraley* was interpreting a City of Columbus ordinance, not the limitations of the Fourth Amendment. *Id.* at 740.

We cannot resolve whether or when this particular encounter escalated to the level of an arrest because Craska has not conceded the plaintiffs' version of the facts.[9] While the plaintiffs claim that Craska roughly grabbed Ficker and forcefully dragged him over to the zone car before slamming him onto the car to search him, Craska claims that he "merely guid[ed]" Ficker and used the "bare minimum" amount of force. These factual disputes directly implicate the "manner in which [the stop] is conducted" as well as "the degree of force used." *Smoak*, 460 F.3d at 781. Therefore, we lack jurisdiction over this issue.

### C. Use of Deadly Force

Next, Craska argues that he is entitled to qualified immunity on the plaintiffs' deadly force claim. The plaintiffs reaffirm their contention that we lack jurisdiction over this issue because Craska failed to concede their version of the facts. Indeed, Craska explicitly disputes the plaintiffs' version of the facts surrounding the fight between Ficker and Craska. In the Reply Brief, Craska argues that the plaintiffs "ignore the four times Ficker attempted to kill Officer Craska." Reply Br. 2. Those four times include "Ficker twice attempting to choke Officer Craska with his legs, once attempting to choke Craska with the cord of his portable radio, and finally trying to get Craska's gun from Craska's holster." *Id.*; *see* Appellants' Br. 33 (asserting the same facts). Craska also contends that he warned Ficker to cease resisting, stating "you're going to die." Appellants' Br. 36. Painting a David-and-Goliath scenario, he claims that he was

---

[9] While the general rule is that we must accept the facts in the light most favorable to the plaintiffs, there is one limited exception. *Younes v. Pellerito*, 739 F.3d 885, 889 (6th Cir. 2014). That exception is where the plaintiffs' version of the facts can be "so utterly discredited by the record as to [render them] a 'visible fiction.'" *Id.* Usually, this applies to something akin to the strength of video evidence. *See id.* However, when the disputed facts are based on testimony, this exception is usually not sufficient. *See id.*

Craska argues that this exception applies to three of the plaintiffs' assertions: (1) that Ficker was calling out for help from his neighbors; (2) that Ficker was attempting to get into the house during the fight; and (3) that Ficker and Urbach did not believe that Craska was an authorized police officer. Reply Br. 11. First, Urbach claims that she heard Ficker yelling out to his neighbors for help. Second, Ficker's neighbor saw him attempt to move towards the house during the fight. Third, Urbach states she was actively attempting to determine whether Craska and Mindek were authorized to act in Parma. Because there is at least some evidence in the record establishing these facts, we decline to accept the defendants' invitation to reject them as wholly unsupported by the record.

physically exhausted from the fight, that he could not see because his glasses had been knocked off, and that he was "on the edge of consciousness." *Id.*

The plaintiffs, on the other hand, argue that it was *Craska* who was the aggressor in this situation, which began when Craska unnecessarily grabbed Ficker and dragged him to the zone car to search him. They assert that after Craska unsuccessfully attempted to shove Ficker into the zone car, Craska punched Ficker in the face. While the pair was wrestling, the plaintiffs claim that Craska choked Ficker; that Ficker never threatened Craska by stating, "No, fuck you,"; and that when the pair broke apart, it was Craska who went after Ficker and continued fighting. Further, the plaintiffs argue that Craska survived the fight with only minor scrapes, as compared to Ficker, who "sustained at least thirty separate injuries, including abrasions, hemorrhages, and contusions all over his body." Appellees' Br. 26.

Claims of deadly force are governed by the Fourth Amendment's reasonableness standard. *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 902 (6th Cir. 1998). In *Tennessee v. Garner*, 471 U.S. 1, 3 (1985), the Supreme Court forbade officers from using deadly force unless "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or to others." When reviewing deadly force claims for reasonableness, we pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The central legal question is whether a reasonably well-trained officer in the defendant's position would have known that shooting the victim was unreasonable in the circumstances." *Sova*, 142 F.3d at 903.

The facts the parties disagree about directly implicate the considerations surrounding a deadly force claim. Thus, we lack jurisdiction over this issue, as it is not our place to resolve these factual disputes.[10] *See Sova*, 142 F.3d at 903 ("Where, as here, the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability.").

## III.

### A. Investigatory Frisk

Mindek claims that he is entitled to qualified immunity for the initial seizure, the grabbing of Ficker for the *Terry* frisk. Both parties seem to agree that Mindek removed Ficker's arm from the zone car. Thus, we have jurisdiction over this issue. Like Craska, Mindek cites to *Thomas* for the proposition that his minimal use of force did not result in a detention, and therefore, it does not implicate the Fourth Amendment, as there was never a "seizure." 77 F. App'x at 864.

Mindek's argument is belied by case law. The Supreme Court has stated, "The word 'seizure' [in the Fourth Amendment] readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful." *California v. Hodari D.*, 499 U.S. 621, 626 (1991). Accordingly, Mindek's

---

[10] Craska argues that even if he were to concede these factual disputes, he is entitled to qualified immunity under *Mullenix v. Luna*, 136 S. Ct. 305 (2015). He asserts that *Mullenix* suggests that when an officer is "faced with a person who has clearly demonstrated intent and willingness to use deadly force against an officer or member of the public, [the officer] is justified in using deadly force and qualified immunity shields the officer from any liability in employing deadly force." Reply Br. 14. However, *Mullenix* warns courts against defining clearly established law at high levels of generality. 136 S. Ct. at 308. It stresses that we must look to "the specific context of the case." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Accepting Craska's invitation to apply *Mullenix* to this case would fly in the face of that tenet. *Mullenix* analyzes whether an officer who "confronted a reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering an officer" was justified in using deadly force. *Id.* at 309. These facts are not similar to the facts at issue here. Therefore, *Mullenix* is inapposite and does not entitle Craska to qualified immunity.

Additionally, because we lack jurisdiction to review this issue, we need not address Craska's claim that the district court improperly relied on Mindek's reaction to the situation to analyze Craska's use of deadly force.

touch could constitute a Fourth Amendment violation. *See Florida v. Bostick*, 501 U.S. 429, 434 (1991) (indicating that an encounter between police and citizens could lose its consensual nature and constitutes a seizure when an officer, "by means of physical force . . . has in some way restrained the liberty of a citizen" (quoting *Terry*, 392 U.S. at 19 n.16)).

Furthermore, Mindek does not argue that he had reasonable suspicion to engage in an investigatory stop.[11] Thus, a reasonable jury could conclude that his use of physical force to assist in conducting a pat down of Ficker violated clearly established law. We accordingly deny qualified immunity for this issue. *See Adams*, 407 U.S. at 146.

## B. Failure to Prevent Use of Deadly Force

Mindek next argues that he is entitled to qualified immunity for the plaintiffs' claim that he failed to intervene to prevent the use of deadly force. He utilizes the same set of facts that Craska asserts. *See* Reply. Br. 18 ("Appellant Mindek incorporates the facts as previously stated in Appellants' Merit Brief as well as previously stated in this Reply . . . ."). Relevantly, he argues that the district court "completely ignored [his] unrefuted testimony." Appellants' Br. 41-42. Mindek stated that "as Craska and Ficker were struggling on the ground, Mindek sought to assist Craska. Mindek was kicked and fell backward. He landed several feet from Craska and Ficker. As Mindek was getting up and turning back towards Craska and Ficker, Craska fired." Appellants' Br. 42. Mindek argues that based on this series of events, he could not have possibly attempted to stop Craska's use of deadly force.

---

[11] Mindek apparently convolutes *Terry* stops with *Terry* frisks. While he states that "[d]efendants possessed reasonable suspicion to make an investigatory stop," he seems to argue that both he and Craska were justified in conducting a protective frisk and that Ficker was never actually detained for purposes of the Fourth Amendment. Appellants' Br. 35-37; Reply Br. 16-18. However, we review *Terry* stops and *Terry* frisks separately. *United States v. McMullin*, 739 F.3d 943, 945-56 (6th Cir. 2014). Accordingly, we address the issue Mindek brought on appeal—namely, whether his arm grab was justified under the Fourth Amendment's protective frisk jurisprudence.

Contrary to this statement, the plaintiffs point to an interview of a neighbor who witnessed the fight between Craska, Mindek, and Ficker. The neighbor told Parma police that when Craska shot Ficker, Mindek was "nowhere in the picture." The neighbor also said that while Mindek was involved in the fight at times, as he attempted to break up the leg hold Ficker had on Craska's head, Mindek otherwise simply watched Craska and Ficker wrestle.

We have held that police officers may be held liable for a failure to protect an individual from the use of excessive force. *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). "Generally speaking, a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Id.* (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).

The disputed facts we have previously discussed directly implicate these considerations. Whether Mindek was watching the fight from the sidelines, whether he was actively involved, or whether he was incapacitated affects both whether he had knowledge that Craska was about to use excessive force and whether he had the opportunity to intervene. Because Mindek does not present us with a "neat abstract issue[] of law" to analyze, we lack jurisdiction over this issue.[12] *Ortiz*, 562 U.S. at 191.

## IV.

Both Craska and Mindek claim that they are entitled to statutory immunity, pursuant to O.R.C. § 2744, in response to the plaintiffs' numerous state law claims: willful, wanton, and reckless conduct; assault and battery; false arrest; intentional infliction of emotional distress on

---

[12] Mindek also asserts that Ficker does not have a clearly established constitutional right "to have an officer intervene to protect [him] from the consequences of [his] own conduct." Appellants' Br. 43; Reply Br. 20-21. Even if this were a claim that the plaintiffs brought, it relies on the same disputed facts as the plaintiffs' deadly force claim. Thus, we lack the jurisdiction to address it.

behalf of Urbach; wrongful death; and survivorship. Because statutory immunity is a complete defense to suit in Ohio, we have jurisdiction over interlocutory appeals of denials of summary judgment. *Chesher v. Neyer*, 477 F.3d 784, 794 (6th Cir. 2007). We review such appeals *de novo* based on the summary judgment standard. *Pritchard v. Hamilton Tp. Bd. of Trustees*, 424 F. App'x 492, 508 (6th Cir. 2011). Thus, a party is entitled to summary judgment if the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Oh. Civ. R. 56(C). "Ohio courts apply a presumption of immunity." *Sabo v. City of Mentor*, 657 F.3d 332, 337 (6th Cir. 2011) (citing *Cook v. City of Cincinnati*, 658 N.E.2d 814, 821 (Ohio Ct. App. 1995)).

Under O.R.C. § 2744.03(A)(6), officers are entitled to immunity unless one of the following exceptions applies:

> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
> (c) Civil liability is expressly imposed upon the employee by a section of the Revised Code.

When we review a claim for statutory immunity, we may not grant summary judgment "unless reasonable minds can only conclude that (1) the employee did not act outside the scope of his employment, or (2) the employee did not act with malicious purpose, in bad faith, or in a wanton or reckless manner." *Long v. Hanging Rock*, No. 09CA30, 2011 WL 4584930, *5 (Ohio Ct. App. 2011). Furthermore, "[s]ummary judgment is appropriate only when the facts are clear and fail to rise to the level of conduct that could be construed as malicious, in bad faith, or wanton and reckless." *Id.*

Craska and Mindek argue that the district court erred in concluding that they may have been acting outside the scope of their employment[13] and that their conduct may have been wanton or reckless.

### A. Scope of Employment

Both Mindek and Craska assert that the first exception does not apply, as they were acting within the scope of their employment. The district court disagreed, concluding that the officers, when in Parma, were acting outside of their jurisdiction. According to the district court, Ohio law allows an officer to pursue a suspect outside of that officer's jurisdiction under two circumstances: (1) when an officer is in hot pursuit and the pursuit originated in that officer's jurisdiction, O.R.C. § 2935.03(D)(1)-(2); and (2) when an officer has an arrest warrant for an individual located outside the officer's jurisdiction, O.R.C. § 2935.02. The district court found that neither of those situations applied to the case at bar. Lastly, the district court concluded that because neither Craska nor Mindek actually observed Ficker commit a crime, they were unable to arrest Ficker under Ohio law. *See* O.R.C. § 2935.04.

On appeal, the officers rely on O.R.C. § 2935.03(D) and *State v. Dotson*, 520 N.E.2d 240, 243 (Ohio Ct. App. 1987), for the proposition that they have authority to investigate crimes outside their jurisdiction and that that authority implicitly carries with it the power to conduct an investigatory stop. Section 2935.03(D) allows a police officer to pursue an individual outside the bounds of his jurisdiction if three conditions are met:

---

[13] Craska and Mindek make this argument in relation to their claims that they are entitled to federal qualified immunity and adopt it in their argument for statutory immunity. However, whether Craska and Mindek were acting within the scope of their employment has no bearing on whether they are entitled to qualified immunity for the plaintiffs' federal claims. *See al-Kidd*, 563 U.S. at 735 (explaining that qualified immunity is based on whether an official violated a constitutional right and whether that right was clearly established); *Tripp v. Dep't of Def.*, 173 F. Supp. 2d 58, 62-63 (D.D.C. 2001) (noting that scope of employment is a question for absolute immunity, not qualified immunity). Thus, we address this issue here.

(1) The pursuit takes place without unreasonable delay after the offense is committed;
(2) The pursuit is initiated . . . within the limits of the territorial jurisdiction of the peace officer; [and]
(3) The offense involved is a felony, a misdemeanor of the first [or second] degree or a substantially equivalent municipal ordinance . . . or any offense for which points are chargeable pursuant to section 4510.036 of the Revised Code.

Additionally, Craska and Mindek primarily rely on the following language from *Dotson*:

We are cited to no authority that city police cannot investigate criminal activity occurring in areas outside the city limits. The drug traffic does not stop at town boundaries and may have serious damaging effects upon the population of the town. We know of no reason that a city or town cannot protect its citizens and schools by initiating and conducting investigations in nearby areas. The only problem would appear to be whether the city wished to finance such investigations, a matter for city council and not for the courts.

520 N.E.2d at 243.

The officers' decision to leave Cleveland and investigate the crime in Parma does not fall within § 2935.03(D). Craska and Mindek did not view Ficker commit a crime, they were not in pursuit of Ficker when they left Cleveland for Parma, and their interactions with Ficker did not begin in Cleveland. *See, e.g.*, *State v. Black*, 2004 WL 88857, *2-3 (Ohio Ct. App. Jan. 16, 2004) (holding that an officer who began pursuing a speeding car in his jurisdiction met the three conditions of § 2935.03(D)).

Further, the officers' reliance on *Dotson* is misplaced. *Dotson* stands for the proposition that police in Ohio may *investigate* crimes outside of their jurisdictions; it does not bestow upon police the power to stop, search, and otherwise physically confront citizens across the state. 520 N.E.2d at 243 ("Clearly here the city police had such authority [to investigate] and did not attempt to, in any way, exercise a power to arrest or to execute a search warrant beyond the city limits. Essentially they were witnesses."). *Dotson* involved a confidential informant, not a police officer, purchasing drugs on behalf of the police while in another jurisdiction. *Id.* at 242.

This investigation did not involve an officer's pat down or arrest of a suspect. Thus, the facts of this case are distinguishable from *Dotson*.

According to the plaintiffs' version of the facts, Craska and Mindek blatantly ignored Urbach and Ficker's requests to leave them alone and to let them enter their home peacefully. Instead, Craska and Mindek patted down Ficker, certainly exceeding the practical latitude *Dotson* affords. Further, there is a dispute of material fact as to whether and when Craska arrested Ficker. If Craska and Mindek exercised their power to arrest outside of their jurisdiction (as in, the investigatory frisk ripened into an arrest) without witnessing Ficker commit a crime, then a reasonable jury could conclude that they were not "investigating" in line with *Dotson*, and they were therefore not acting within the scope of their employment. The district court properly denied their motions for summary judgment on this basis.

### B. Malicious Purpose, Bad Faith, or Wanton or Reckless Manner

The defendants also argue that the second exception to the immunity statute does not apply, as their conduct was not with a malicious purpose, in bad faith, or wanton or reckless. O.R.C. § 2744.03(A)(6)(b). In *Burgess v. Fischer*, this Court elaborated on how Ohio defines malice, bad faith, and wanton or reckless behavior:

> "Malice" is the willful and intentional design to do injury or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified. A defendant can be said to act in "bad faith" where it is shown that he acted with a dishonest purpose, or conscious wrongdoing, or he breached a known duty through some ulterior motive or ill will. Wanton misconduct is the failure to exercise *any* care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result. And finally, "reckless conduct" is the conscious disregard of or indifference to a known or obvious risk of harm . . . that is unreasonable under the circumstances and is substantially greater than negligent conduct.

735 F.3d 462, 479-80 (6th Cir. 2013) (citations omitted).

When the plaintiffs' state-law claims rely on the same genuinely disputed material facts as their federal claims, we generally decline to grant statutory immunity based on this exception. *See Gradisher v. City of Akron*, 794 F.3d 574, 587-88 (6th Cir. 2015) (concluding that because there was a genuine dispute of material fact with respect to the plaintiff's claim of excessive force, summary judgment was not appropriate on state law claims for assault and battery as well as intentional infliction of emotional distress); *Martin v. City of Broadview Heights*, 712 F.3d 951, 963 (6th Cir. 2013) (denying statutory immunity for state law claims due to genuine issues of material fact, including survivorship and wrongful death). As we have already demonstrated that there are materially disputed facts at issue relating to the plaintiffs' state law claims, the district court properly denied summary judgment to the officers based on this prong of the state immunity statute.

## V.

The last issue we must address is the City's interlocutory appeal of the district court's denial of its summary judgment motion. The City claims that we have pendant jurisdiction over its appeal. We have pendant jurisdiction over issues that are "inextricably intertwined" with qualified immunity considerations. *Bultema v. Benzie Cnty.*, 146 F. App'x 28, 38-39 (6th Cir. 2005) (quoting *Brennan v. Twp. of Northville*, 78 F.3d 1152, 1157 (6th Cir. 1996)). However, "[o]nce a [constitutional] violation is determined to have occurred, [] the question of municipal liability turns not simply on the actions of the individual state actors, but rather on the separate question of whether the violation may be attributed to a municipal policy or failure to train." *Floyd v. City of Detroit,* 518 F.3d 398, 411 (6th Cir. 2008). Such claims are "'not indisputably coterminous with, or subsumed in' the question of the individual defendants'

entitlement to qualified immunity." *Id.* Thus, when a constitutional violation exists, this Court lacks jurisdiction to hear the municipal liability claims. *Id.*

We concluded that we either lacked jurisdiction over the constitutional issues that Craska and Mindek appealed or that a reasonable jury could conclude that Craska and Mindek's conduct violated clearly established law, depriving them of qualified immunity. Thus, we lack jurisdiction over the City's appeal.

## VI.

For the foregoing reasons, we **AFFIRM** in part, **DISMISS** in part, and **REMAND** for further proceedings not inconsistent with this opinion.